## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| KENNETH FEDANCE, individually and on behalf of the class described below, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CLIFFORD "T.I." JOSEPH HARRIS, JR. and RYAN FELTON, | ) ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |
| | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, KENNETH FEDANCE, individually and on behalf of the class described below, by and through his undersigned attorneys, complains against Defendants, CLIFFORD "T.I." JOSEPH HARRIS, JR. and RYAN FELTON as follows:

Plaintiff hereby alleges the following based upon personal knowledge as to the allegations concerning himself and based upon the investigation of his counsel, which includes, without limitation: (a) review and analysis of certain public statements, and other documents disseminated by or concerning the Defendants named herein and related parties; (b) communications with counsel for related

parties; (c) review and analysis of public documents in similar and related cases; and (d) review and analysis of archived publicly available social media postings by Defendants.

## I.      **NATURE OF ACTION**

1.      This is a securities fraud case brought by Plaintiff, who was duped into purchasing now worthless securities called FLiK Tokens.

2.      The Defendants employed social media, celebrity endorsements, and well-known industry experts to create the false impression that FLiK Tokens were a valuable liquid investment in a classic "pump and dump" scheme.

3.      When the "pump" was completed and the price of FLiK Tokens increased from $.06 to $.21, the Defendants and related parties "dumped" their tokens and disappeared from social media. Felton, who had previously been extremely active promoting FLiK Tokens via multiple social media posts per day, stopped updating investors or responding to their inquires. Finally, when the investors realized that they had been duped, Felton created a new company, Skyblock Media Group, LLC, to "acquire" FLiK and speciously told investors that he had nothing to do with the new sham company.

4.      The FLiK initial coin offering ("ICO") was a clear offer and sale of securities under Federal Law because, *inter alia*, Defendants touted, and Plaintiffs

reasonably expected, that the FLiK Tokens received in exchange for their financial investments would increase in value. In fact, Felton stated that the securities would increase in value from $.06 per token to $14.99 per token in just fifteen months following the ICO—that's a 24,983% increase! Additionally, as discussed herein, Defendants have explicitly referred to the FLiK ICO participants as "investors" and repeatedly stressed the profit potential from holding FLiK Tokens.

5.    Sections 12 and 15 of the Securities Act of 1933 ("Securities Act") registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent required registration, issuers of securities can tout their investment opportunities with no limitations whatsoever. For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.* conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, and business strategies, or even fabricate the existence of relationships with vendors or other business partners.

## II.    **THE PARTIES AND OTHERS**

6.    Plaintiff, Kenneth Fedance ("Fedance"), is a citizen of California and resides in California.

7.    Defendant, Clifford Joseph Harris, Jr. ("T.I."), is a citizen of the State of Georgia and, at all relevant times, was FLiK's controlling shareholder.

8.    T.I. is rapper and actor from Atlanta, Georgia.

9.    T.I. has also had a successful acting career, starring in the films ATL, Takers, Get Hard (with Kevin Hart), Identity Thief, and Ant-Man II.

10.    Defendant, Ryan Felton ("Felton"), is a citizen of the State of Georgia and, at all relevant times, was FLiK's controlling shareholder.

11.    Felton, has held himself out as an "entertainment executive" based in Atlanta with a history of founding entertainment-related and cryptocurrency-related businesses. Felton claims that he has worked with a multitude of television networks, corporate brands, and film and television shows. He claims his recent projects include: Stranger Things, Monday Night Football, Queer Eye for the Straight Guy, Dynasty, Rolling Stone Magazine, and National Geographic.

12.    Felton is a serial Defendant in Georgia Courts, and most notably, has been previously convicted of perjury and false statements.

13.    Tony Gallippi ("Gallippi") is a citizen of the State of Georgia and, at all relevant times, was FLiK's "advisor".

14.    Gallippi was the co-founder of BitPay and has been responsible for a number of large businesses adopting bitcoin payments. During the surge of

popularity of bitcoin, Gallippi was featured regularly in the media discussing bitcoin and BitPay.

15.    In 2013, BitPay became the largest processor of bitcoin payments worldwide, and began securing partnerships with major companies like Microsoft, Intel, VISA, Newegg, Shopify, and more.

16.    Kevin Darnell Hart ("Hart"), is a citizen of the State of California and, at all relevant times, was FLiK's celebrity endorser.

## III.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiff alleges violations of Sections 12(a)(1) and 15(a) of the Securities Act.

18.    This Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in Georgia in this District or is an individual who either is present in Georgia and this District for jurisdictional purposes or has sufficient minimum contacts with Georgia and this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper pursuant to Title 28, United States Code, Section 1391 because Defendants reside in this District, conduct business in this District, and because many of the acts and transactions forming the basis of the claims in this action occurred in substantial part in this District.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A. FLiK Tokens are Securities Requiring Registration

20.    On April 24, 2019, the Northern District of Georgia held in *Beranger, et al. v. Harris, et al.*, Case No. 18-cv-05054 that FLiK Tokens were securities. FLiK Tokens were not registered with the United States Securities Exchange Commission (the "SEC").

21.    The FLiK ICO and sale of FLiK Tokens were the sale of unregistered securities under controlling federal law. Specifically, this Court in *Beranger v. Harris* held that FLiK Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any FLiK Tokens, an investment of money was required; (b) the investment of money was made into the common enterprise that is FLiK; (c) the success of the investment and any potential returns on such were entirely reliant on Defendants' ability to create the promised FLiK.

22.    An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for

consideration (often in the form of other digital assets—most commonly Bitcoin and Ether—or fiat currency).

23.    On November 8, 2017, Jay Clayton, the newly appointed Chairman of the SEC, delivered a speech to the 49th Annual Institute on Securities Regulation in which he equated ICOs with securities. After this speech, the Wall Street Journal reported Chairman Clayton stated "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security." This statement sums up the core issue here quite succinctly. The fact of the matter is, digital currencies are a relatively new technology and various parties are taking advantage of the time it takes for regulatory agencies to address developments in the area to engage in unlawful conduct with near impunity.

24.    Cryptocurrencies, like the FLiK Tokens, typically are issued on a "blockchain" or cryptographically-secured ledger.

25.    Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called exchanges, and are tradable for other digital assets or fiat currencies. Often, the tokens are immediately tradable.

26.     ICOs are typically announced and promoted through public online channels. Issuers usually release a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often Bitcoin or Ether) to the issuer's digital address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

27.     Like traditional "penny stocks," it is easy to "pump" up the price of cryptocurrencies by issuing false and misleading statements promising breakthroughs by the related company that will increase the value of the cryptocurrency. Then, when the value has increased significantly on the exchange, investors—including the company insiders—can "dump" their cryptocurrency on the exchange to unwitting investors who believed the fake news. So, the insiders benefit twice, first by receiving the initial investment from the ICO, then again by selling their tokens on duped investors at an inflated price.

28.     Additionally, as this Court recognized in *Beranger v. Harris*, by their very nature, tokens sold before a network launch are securities, because investors purchasing those tokens are relying primarily on the technical and managerial efforts of others to affect the failure or success of the enterprise.

29.    While pre-network launch tokens may someday have a consumptive use, the fact that they have no pre-launch utility renders them almost entirely dependent upon the efforts of the issuer to successfully develop and launch a functional network.

30.    Here, Plaintiff and the members of the proposed class (the "Plaintiffs") were (and still are) entirely dependent upon Defendants to launch and develop the FLiK business model, and provide value to the FLiK Tokens for which Plaintiffs have already provided their investment funds.

31.    On December 1, 2017, the SEC filed a complaint against PlexCorps for selling unregistered securities in connection with the "PlexCoin Token" ICO. Similarly, on December 11, 2017, the SEC announced that it had shut down Munchee Inc., a California-based online food review company, which had been planning on conducting an ICO. It is clear from recent events that the rampant disregard of federal securities laws and, consequently, abuse of investors taking place in the ICO space has been noted by regulatory agencies, including the SEC.

32.    FLiK attempted to avoid many regulatory checks by collecting money for the purchase of FLiK Tokens via other cryptocurrencies like Bitcoin, Ethereum, and other virtual currencies, which can be used as payment  without going through any banks or other middlemen that might look into the legality of the transactions.

33.    On or about August 12, 2017, FLiK published a whitepaper to solicit investments that was evaluated by Plaintiffs prior to making their investment in FLiK via the purchase of FLiK Tokens (attached hereto as Exhibit "A" and incorporated herein).

34.    FLiK introduced itself in its whitepaper as follows:

Blockchain technology is a groundbreaking technology that are [*sic*] revolutionizing the way companies conduct business in the 21st century. However, these technologies are still in the early stages of adoption. Consequently, many new business use applications are being marketed to bridge the gap between technical complexity and usability of Blockchain. The potential in this growing market along with increasing deployment of Blockchain business applications and the acceptance of cryptocurrencies, such as Bitcoin, Ether, and Dash, makes new projects extremely appealing for both start-ups and Blockchain enthusiasts alike.

35.    The goals for FLiK were also detailed in its whitepaper as follows:

FLiK is a young and innovative company that aims to bring creative entertainment projects to life, and give creatives from around the world the opportunity to earn a living in an inherently difficult industry. Specifically, our goals are:  To develop an online distribution platform that will allow creatives to sell / rent their work.  To fund a slate (grouping) of unique and creative entertainment projects that might not otherwise receive funding.

36.    FLiK stated its objective as follows:

Currently, we are working with various creatives to identify qualified entertainment projects to fund.  Additionally, we are in the process of developing our online viewing platform that allows creatives to sell / rent their projects. The platform will be launched and hosted at www.TheFlik.io.

Our ultimate objective is to fund creative film and television projects and give all such projects an online home on a unique and innovate viewing platform that benefits the creatives.

'

37.    FLiK identified several projects that the investment in FLiK Tokens

purportedly would fund, including "FLiK Streaming" and "FLiK Funding" which

were explained in its whitepaper as follows:

FLiK is developing a world-class video streaming platform that gives creatives the ability to self-distribute their film or television show to a global audience. We eliminate the cumbersome traditional distribution models, and put the earnings power directly into the hands of the creators. We allow creatives to earn the lion's share of the profits; up to 98% The essential highlights include: Familiarity – The FLiK platform will feel intuitive and similar in functionality to other online platforms such as YouTube, Netflix, and Vimeo. Discoverability – Because FLiK is catering to independent filmmakers and television creatives, our platform will allow viewers to discover new and interesting projects that they might not otherwise have access to.

Traditional film and television funding is an arduous, antiquated, and time-consuming process involving a host of bankers, lawyers, and investors. Funding a film or television show often takes years and sometimes decades. It doesn't have to be like this.  FLiK works with qualified creatives and Producers to get projects funded quickly and efficiently. The projects that FLiK helps fund will be available exclusively on the FLiK platform, therefore it is imperative that FLiK develops the right projects. Deciding what projects to fund and develop is certainly not easy.  FLiK has developed the following five criteria to determine if a project is "green-lit":

38.    FLiK Tokens are a form of cryptocurrency issued by FLiK pursuant to

an "initial coin offering" or "ICO" between August 20, 2017 and September 20,

2017. The tokens were then traded on a cryptocurrency exchange called

coinexchange.com, which acts like a stock market for hundreds of different cryptocurrencies. The value of many cryptocurrencies, like FLiK Tokens, are tied to the development of a related underlying business or technology.

39.    FLiK detailed its ICO in its whitepaper as follows:

About the Crowdsale: A total of 50,000,000 tokens are available for purchase during our sale; 500,000,000 are available for distribution (see "Important Update" below for details). FLiK tokens are ERC20-compliant tokens. All unsold tokens will be burned.
Use of Funds
50% will be used for licensing content from major studios.
25% will be used to fund unique and creative film projects.
15%  will be used for marketing and promotion of the FLiK platform.
10% will be used for implementation with additional viewing platforms.

40.    At some time in mid-2017, Felton created FLiKIO, an offshore entity whose actual name and location are unknown and have been maintained under strict secrecy by the Defendants.

41.    In its whitepaper, FLiK admitted it was subject to SEC Regulation, but incredibly never registered the FLiK Tokens as securities.

42.    FLiK tried to avoid the fact that FLiK Tokens were obviously a security with the following specious statement in their whitepaper:

"FLiK is not offering a cryptocurrency, we are offering a cryptographic token that will be redeemable via the FLiK viewing platform, TheFlik.io, and potentially redeemable via additional online viewing platforms"

**B. Defendants' Misrepresentations regarding FLiK**

43.    In reality, FLiK is an empty shell that never developed any actual business. At best it was a grand idea that never materialized into anything; at worst it was a total fraud from the start designed to dupe mostly foreign investors into buying the Defendants' magic beans.

44.    On August 1, 2017, FLiK launched a Facebook page and announced that "FLiK is coming… #HelloWorld. First Tweet." Felton also created accounts for FLiK on popular social media platforms Twitter and Instagram, and on Telegram and bitcointalk.org, internet applications popular among cryptocurrency investors.

45.    In early August 2017, FLiK announced through its social media platforms that it planned to launch its ICO on August 20, 2017, through coinexchange.com, a marketplace where investors can buy and sell hundreds of cryptocurrencies. From the date of the initial announcement through the date of the ICO, FLiK posted multiple announcements every day through its social media outlets "pumping" the perceived value of FLiK Tokens in anticipation of the FLiK ICO.

46.    For example, on August 16, 2017, FLiK announced that T.I. had joined FLiK as a Co-Owner with Felton.

47.     The following day, on August 17, 2017, FLiK announced that Gallippi, would be joining FLiK as an "advisor" when, in fact, Gallippi had purchased only $500 worth of FLiK Tokens and had no role with FLiK as an "advisor." The following was posted by FLiK to its Telegram group, TheFLiKio:



48.     Three days later, on August 20, 2017, FLiK initiated the ICO, issuing FLiK Tokens to investors at a value of approximately $.06 per token.

49.     Also on August 20, 2017, Felton announced that "Flik has another new co-owner, but we can't name him just yet.  :)" Felton implied that the "new co-owner was billionaire and media mogul Mark Cuban by stating that the new co-owner "currently owns a large stake in another video stream platform (one you've heard of); so we're working to get him unattached from the platform quickly." Investors,

like the Plaintiffs, clearly understood this to be a reference to Cuban, who is widely known to be a significant investor in Netflix. Felton did not contradict the "rumor" that quickly spread among FLiK's Telegram group members that Cuban would become a co-owner of FLiK.

50.    Upon information and belief, Felton created a fake Telegram account designed to intentional mislead investors into believing that Cuban was personally endorsing FLiK Tokens with posts to the Telegram group.

51.    Then, on August 22, 2017, Felton asked via Telegram, "Poll: Who is familiar with Kevin Hart?" because he was "trying to get a sense of how popular Kevin is in Asia (China, South Korea, Japan, etc.).  (sorry to be vague!)". Members of the group reasonably understood this post to imply that Hart would become the "face" of FLiK, which Felton did not dispute. In response to inquiries from members of the Telegram group regarding Hart's involvement, Felton posted: "Potentially... NOTHING official yet.  T.I. and I chat with him again late tonight.  T.I. is currently filming Ant-Man 2 and we can't re-connect with Kevin until around 10:00 tonight."

52.    The next day, on August 23, 2017, Hart Tweeted a photo of him with Harris noting that the photo was of "Me telling [TI] how much help he gonna make on his new venture. Lmfao But seriously, I'm Super Excited for T.I. and FLiK **They're gonna crush it!** #ICO #blockchain #crypto #bitcoin." (emphasis added).



53.     Three days later, on August 26, 2017, FLiK announced through social media that a "big buyer" was "buying $500,000 worth of tokens," a "major wallet integration," a "deal" with Hart, and that FLiK would be "integrated into the U.S. military's set top box" granting FLiK access "to potentially 2,000,000 customers."

54.     On the same day, FLiK shared a photo of what appeared to be members of the U.S. military watching FLiK, and represented that FLiK was "working on a blog post announcing [FLiK's] integration into a new streaming platform for the U.S. military." Felton also announced that FLiK was "finalizing an agreement with Lionsgate to license their film library of 15,000 films. This gives [FLiK] great content on day one!"

55.     On August 29, 2017, Felton announced that FLiK was bringing Hart on "as owner of the business."

56.     On August 30, 2017, T.I. encouraged his more than 8 million followers on Twitter to "Check out my new #ICO @TheFLiKIO it's about to change #Hollywood!!! #Crowdsale #Blockchain."



57.     On September 2, 2017, FLiK announced via Facebook "major investment" via private placement, and that this investment will allow it to "adjust its ICO."

58.    On September 3, 2017, FLiK announced via Facebook that it had received a $100,000 investment.

59.    October 15, 2017, T.I. posted a picture of him via Twitter meeting with Cuban, further fanning the flames of the uncontradicted rumor advanced by FLiK that the billionaire media mogul was or would be involved with FLiK.

60.    October 18, 2017, Felton posted on a variety of social media outlets that tokens "will be redeemable for $3.99 in 3 months, $9.99 in 12 months and $14.99 in 15 months."



61.    On or about the same day, in a Tweet that was reposted on Telegram, Felton specifically referred to FLiK as a "growing multi-billion dollar company." Felton also announced via Twitter that he was "[h]appy to be making our first @FLiKIO related film investment this week."

62.    October 19, 2017, someone (upon information and belief Felton) with the user name "Go Mavs" linked to the Twitter account @darkmuban (a thinly veiled pseudonym for Cuban) posted an article titled "FLIK Price Analysis & Why Its Heading to $15" on medium.com. An identical article is posted to steemit.com.

63.    The foregoing representations appear to be in whole or in part false and, as intended by the Defendants, caused by the value of FLiK tokens on the coinexchange.com to increase to $.30 on October 17, 2017, an increase of 800% over the ICO price.

64.    On October 22, 2017, FLiK "burned" 52,000,000 of the unsold FLiK Tokens, effectively taking them out of potential circulation, which typically increases the value of the issued tokens.

65.    On October 26, 2017, FLiK announced via Facebook that it had made its first film investment and would produce a film called *Summer Night*. However, FLiK was not listed as one of the production companies on Summer Night's IMDB page. And, an online article that initially listed Felton as a producer was immediately corrected to delete reference to him. Additionally, *Summer Night* is not listed under Felton's Producer credits on his IMDB page. In fact, none of the producer credits listed by Felton on the FLiK homepage are listed on his IMDB page.

66.    On October 26, 2017, a "show" titled "The Late Night Startup Show – Ep. 101 – Ryan Felton of FLiK" was posted to YouTube.com. The video was an interview of Felton discussing and promoting FLiK. The Late Night Startup Show was a creation of Felton to lend credibility to FLiK, was shot a studio owned by an affiliate of Felton, and "Ep. 101" was the first episode, not the 101st.

a.  At 22:00 of the Youtube video, Felton states that T.I. will be able to get meetings with entertainment companies so that FLiK can license their content.

b.  At 23:00 of the video, Felton very strongly implied that former NBA star and friend of Kevin Hart, Shaquille O'Neal, was very interested in FLiK and may become an owner.

c.  At 25:30 of the video, Felton represented that both he and T.I. had personally invested funds in FLiK in addition to other private investors.

d.  At 30:00 of the video, Felton represented that FLiK was "beta testing" its streaming platform, that FLiK would acquire the rights to "thousands" of movies to stream on the platform, and that FLiK was in the process of acquiring the domain www.flik.com. None of these representations came to pass.

67.  Investors in FLiK ate up the explosive series of announcements and promises. The posts by investors on various FLiK message boards focused on FLiK's credibility due to involvement of T.I., Hart, Gallippi, and (allegedly) Cuban, as well as Felton's promises of imminent entertainment licenses and the purported partnership with the U.S. armed forces.

68.     October 29, 2017, FLiK announced via Twitter that it would be at the American Film Market in Santa Monica. However, FLiK was never listed as a participant and did not participate.

69.     On April 3, 2018, in its final Tweet, FLiK announced that it has "missed their deadline" to launch its streaming service.

70.     As the member posts to the FLiK Telegram group grew increasingly suspicious that FLiK was, in fact, a scam, Felton rushed to delete his aforementioned social media posts hyping the value of FLiK tokens, but it was too late. Many of the defrauded investors had saved "screenshots" of Felton's multiple fraudulent statements.

71.     The much-hyped FLiK services, in fact, never launched. FLiK promised that it would update its website. The website was never updated and, in fact was deleted.

## C. The FLiK Market Crashes

72.     In late 2017, on the heels of the aforementioned social media posts designed to pump the value of the FLiK Tokens, a massive "dump" of FLiK Tokens occurred greatly devaluing the tokens, causing substantial losses to investors in the cryptocurrency, including the Plaintiffs.

73.    Following the "dump," FLiK virtually disappeared from social media, and Felton stopped responding to inquiries from FLiK investors.

74.    In a direct message to one FLiK investor, Felton claimed that the devaluation was caused, at least in part, because T.I. had given a portion of his FLiK Tokens to members of his family and friends, who then sold massive amounts those tokens on coinexchange.com, thus precipitating rapid devaluation.

75.    Even after the "dump," many of FLiK's investors continued to believe Felton's promises and continued to invest in FLiK Tokens.

76.    On February 15, 2018, as a result of the Defendants' manic and unrelenting promotion of FLiK and the value of the FLiK Tokens, FLiK had a market cap of $11,057,000 at a price per token of $.1839, an increase of more than 300% from the ICO.

77.    On April 3, 2018, Felton announced that FLiK had missed its launch deadline "attributed to one primary factor: licensed content. Without licensed content, we cannot go live." Felton had also promised a new website for FLiK, which never materialized. No official announcements followed and FLiK's Facebook page has not been updated since.

78.    As of August 3, 2018, FLiK tokens are only worth $.008256 with a market cap of $496,366.

**D. Creation of Skyblock and Purported Transfer**

79.    On August 28, 2018, Skyblock Media Group, LLC ("Skyblock") was created as a Delaware limited liability company. On the same day, the internet domain www.skyblockmediagroup.com was registered and a basic one-page site was published based on the same WordPress templates previously used by Felton for the FLiK website as well as websites of his various other endeavors. The SkyBlock website does not list the names of any individuals associated with SkyBlock, an email address, or an office address.

80.    August 29, 2018, FLiK announced that it had been "acquired" by SkyBlock. After its initial publication, a "press release" posted on the SkyBlock website was dated July 8, 2018, giving the impression that SkyBlock Media Group, LLC was not created on August 28, 2018.

81.    Backed into a corner and in a desperate attempt to maintain the increasingly unbelievable charade, Felton told FLiK investors calling his bluff that "no one who was involved in FLiK is involved with SKYBLOCK." Felton also contacted the administrator of the FLiK Telegram account, an individual who he had paid FLiK Tokens to manage the message board, and insisted that the new owners of SkyBlock "will reach out to you regarding the Telegram group." The

administrator refused to transfer access to the account out of fear that Felton would delete the account, as he had several of his most incriminating posts and Tweets.

### E. Felton Fraudulently Concealed the True Nature of FLiK

82.    Plaintiff was unaware until this Court's Ruling on April 25, 2019 that FLiK was a security subject to regulation.

83.    Felton fraudulently concealed the true nature of FLiK as detailed herein.

84.    Plaintiff was unaware of any facts giving rise to this action due to Felton's fraudulent misstatements and omissions promising that FLiK had actual utility therefore was not a security.

85.    Felton's fraudulent misrepresentations continued through August 2018 with the creation of SkyBlock and the alleged acquisition of FLiK by SkyBlock and its "new owners."

86.    Plaintiff could not have possibly known sufficient facts to bring this action until September 2018, at the very earliest.

### F. Plaintiff's Losses

87.    On August 23, 2017, Plaintiff invested $3,000 in FLiK's ICO.

88.    There is no market for FLiK Tokens and they are worthless.

89.     Felton represented that the FLiK Tokens would be worth $14.99 by the middle of 2019.

90.     FLiK Tokens reached a peak inter-day trading value on October 17, 2017 of $.356020 as depicted in the chart below:



91.     Plaintiff's has suffered damages in an amount of his total investment in FLiK Tokens: $3,000.

**IV.    CLASS ALLEGATIONS**

92.     A class action is the proper form to bring Plaintiff's and the Class Members' claims under Fed. R. Civ. P. 23. The potential class is so large that joinder of all members would be impractical. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

93.     Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all members of the following class:

> FLiK investors who, between August 20, 2017 and September 20, 2017, transferred bitcoins, Ether, alternative cryptocurrencies, or any other form of monies or currency to Defendants in furtherance of FLiK's ICO and not provided a refund of their investment at the rate prevailing at the time of the refund. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.

94.     The Class asserts claims for Unregistered Offer and Sale of Securities the Securities Act and Rescission (Counts I and II).

95.     This action satisfies all of the requirements of Rule 23, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

96.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

97.     While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

98.     Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

99.   It is impractical for each class member to bring suit individually.

100.   Plaintiff does not anticipate any difficulties in managing this action as a class action.

101.   There are many common questions of law and fact involving and affecting the parties to be represented.

102.   When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions.

103.   Common questions include, but are not limited to, the following:

a. Whether the FLiK Tokens offered for sale constitute securities under federal securities laws;

b. Whether Defendants violated federal securities laws in conducting the Initial Coin Offering and in failing to register the FLiK Tokens as securities;

c. Whether statements made by Defendants before the scheduled FLiK ICO misrepresented material facts about FLiK and the value of FLiK Tokens;

d.  Whether Defendants have converted the funds belonging to Plaintiff and the Class Members;

e.  Whether Defendants owed duties to Plaintiff and the Class Members, what the scope of those duties were, and whether Defendants breached those duties;

f.  Whether Defendants' conduct was unfair or unlawful;

g.  Whether Defendants have been unjustly enriched; and

h.  Whether Plaintiff and the Class Members have sustained damages as a result of Defendants' conduct.

104.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.

105.  Plaintiff's claim is typical of those of the other Class Members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

106.  Plaintiff is advancing the same claims and legal theories on behalf of itself and all members of the Class.

107.  Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

108.   Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent them.

109.   Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

110.   The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

## V.    CLAIMS

### COUNT I
**Violation of Section 12(a) of the Securities Act against T.I. & Felton**

111.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 110 of the Complaint as though fully set forth herein.

112.    Section 12(a)(1) grants Plaintiff a private right of action against any person who:

> offers or sells a security in violation of Section 5, and states that such person:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

113.    From approximately August 1, 2017 through October 30, 2017, in connection with the FLiK ICO, Defendants T.I. and Felton unlawfully made use of means or instruments of transportation or communication in interstate commerce or the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of Sections 5(a) and 5(c) of the Securities Act.

114.    The FLiK ICO and sale of FLiK Tokens were the sale of unregistered securities under controlling federal law. FLiK Tokens exhibit the following

particular hallmarks of a security under the *Howey* test: (a) in order to receive any FLiK Tokens, an investment of money was required; (b) the investment of money was made into the common enterprise that is FLiK; (c) the success of the investment and any potential returns on such were entirely reliant on Defendants' ability to create the promised FLiK.

115.  As such, Defendants have participated in an unregistered sale of securities in violation of the Securities Act, and are liable to Plaintiff and the Class for rescission and/or compensatory damages.

## COUNT II
**Claim for Violation of Section 15(a) of the Securities Act Against Felton & T.I.**

116.  Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 110 of the Complaint as though fully set forth herein.

117.  Due to their ownership interest in and control over FLiK, Defendants T.I. and Felton acted as controlling persons of FLiK within the meaning of Section 15(a) of the Securities Act as alleged herein. By virtue of their positions as officers and/or directors and participation in and/or awareness of FLiK's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the FLiK ICO, including the decision to engage in the sale of unregistered securities via the FLiK ICO.

118.    By virtue of the foregoing, Defendants T.I. and Felton are liable to Plaintiff and the Class as control persons of FLiK under Section 15(a) of the Securities Act.

## COUNT III
### "Statutory Seller" Liability for Federal Securities Law Violations Based upon Sale of Unregistered Securities, 15 U.S.C. §§ 77e(a), 77(e)(c) & 77l(a)(1) Against T.I.

119.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 110 of the Complaint as though fully set forth herein.

120.    By reason of the foregoing, Defendants violated Sections 5(a) and 5(c) of the Federal Securities Act. The three elements of a prima facie Section 5 violation are satisfied: [1] the sale or offer to sell securities, [2] the absence of a registration statement covering the securities, and [3] the use of the jurisdictional means.

121.    T.I.'s Tweets were a substantial factor in inducing Plaintiff's purchase.

122.    T.I. was motivated to make social media posts inducing the purchase of FLiK for his own financial gain and financial gain of the owners of FLiK.

123.    Pursuant to Section 12(a)(l) of the Federal Securities Act, 15 U.S.C. § 77l(a)(l), "Any person who offers or sells a security . . . shall be liable to the person purchasing such security from him." Section l2(a)(l)'s "strict" or "absolute" liability for the offer and sale of unregistered securities extends to any person who actively

solicited the sale of the unregistered securities to the plaintiff and did so for financial gain of himself.

124.    T.I. is primarily liable as a statutory seller under Section 12(a)(1), because as alleged above he too through direct and personal contact successfully solicited the purchase of the unregistered securities by Plaintiff and the Class, motivated at least in part by a desire to serve their own financial interests or those of FLiK.

125.    Accordingly, T.I. is under Section 12(a)(1) jointly and severally liable to Plaintiff and the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Kenneth Fedance, individually and on behalf of members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.  A declaration from this Court that this action is a proper class action, including certification of the proposed Class, appointment of Plaintiff as the class representatives, and appointment of Plaintiff's counsel as class counsel;

B.  An Order enjoining Defendants from making further transfers or dissipations of the investment funds and assets raised in connection with the promoted

FLiK ICO, or using such funds and assets in any further purchases or transactions;

C.  A judgment awarding Plaintiff and the Class Members equitable restitution, including, without limitation, rescission of their investments in FLiK, restoration of the *status quo ante*, and return to Plaintiff and the Class Members all cryptocurrency or fiat currency paid to Defendants in connection with the purported ICO as a result of Defendants' unlawful and unfair business practices and conduct;

D.  An award of any and all additional damages recoverable under law – jointly and severally entered against Defendants – including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

E.  An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with the FLiK ICO;

F.  An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

G.  Pre- and post-judgment interest;

H.  Attorneys' fees, expenses, and the costs of this action; and

I.  All other and further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury of 12 on all matters so triable.


/s/ *Jason Doss*

Jason Doss
THE DOSS FIRM, LLC
The Brumby Building
127 Church St, #220
Marietta, Georgia 30060
Telephone: 770.578.1314
Email: jasondoss@dossfirm.com

*Local Counsel for Plaintiffs and the Proposed Class*

Alexander Loftus, Esq.
*Pro Hac Vice Applied For*
Ryan Moore, Esq.
STOLTMANN LAW OFFICES, P.C.
233 S. Wacker, 84th Floor
Chicago, Illinois 60603
T: 312.332.4200
alex@stoltlaw.com
ryan@stoltlaw.com

Patrick Jones, Esq.
PMJ PLLC
100 South State Street
Chicago, Illinois 60603
Tel: (312) 255-7976
pmj@patjonespllc.com

*Attorneys for Plaintiff and the Proposed Class*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiffs certifies that the foregoing has been prepared in Times New Roman, 14-point type, which is one of the font selections approved by the Court in Local Rule 5.1(C).

This 10th day of May  2019.


/s/ *Jason Doss*

Jason Doss
THE DOSS FIRM, LLC
The Brumby Building
127 Church St, #220
Marietta, Georgia 30060
Telephone: 770.578.1314
Email:  jasondoss@dossfirm.com

*Local Counsel for Plaintiffs*

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Kenneth Fedance, declare as to the claims asserted under federal securities laws, as follows:

**(i)** I have reviewed the complaint and authorized its filing;

**(ii)** I did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

**(iii)** I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

**(iv)** All of the transactions in the security that is the subject of the complaint occurred during the class period specified in the complaint;

**(v)** I have never before sought to serve as a representative party on behalf of a class;

**(vi)** I will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

Executed this 4th of May, 2019.

__/s/*Kenneth Fedance*_____
Kenneth Fedance

*FEDANCE*

*V.*

*CLIFFORD "T.I." JOSEPH HARRIS, JR., and RYAN FELTON*

# EXHIBIT "A"



http://www.theflik.io/white-paper.html    Go

12 Aug 2017 – 27 Mar 2018

About this capture



## Meet FLiK

FLiK is an end-to-end entertainment ecosystem that allows for creative projects to be funded,  lmed, distributed, and paid for all within the FLiK framework.  This is a revolutionary approach to the development and distribution of entertainment as we know it.

## Introduction

Blockchain technology is a groundbreaking technology that are revolutionizing the way companies conduct business in the 21st century. However, these technologies are still in the early stages of adoption. Consequently, many new business use applications are being marketed to bridge the gap between technical complexity and usability of Blockchain. The potential in this growing market along with increasing deployment of Blockchain business applications and the acceptance of cryptocurrencies, such as Bitcoin, Ether, and Dash, makes new projects extremely appealing for both start-ups and Blockchain enthusiasts alike.

(https://archive.org/account/login.php)

http://www.theflik.io/white-paper.html    Go

12 Aug 2017 – 27 Mar 2018    About this capture

## Goals

FLiK is a young and innovative company that aims to bring creative entertainment projects to life, and give creatives from around the world the opportunity to earn a living in an inherently difficult industry.

Specifically, our goals are:

- To develop an online distribution platform that will allow creatives to sell / rent their work.
- To fund a slate (grouping) of unique and creative entertainment projects that might not otherwise receive funding.

## Objective

Currently, we are working with various creatives to identify qualified entertainment projects to fund. Additionally, we are in the process of developing our online viewing platform that allows creatives to sell / rent their projects. The platform will be launched and hosted at www.TheFlik.io.

Our ultimate objective is to fund creative film and television projects and give *all* such projects an online home on a unique and innovate viewing platform that benefits **the creatives**.

## FLiK Streaming

FLiK is developing a world-class video streaming platform that gives creatives the ability to self-distribute their film or television show to a global audience. We eliminate the cumbersome traditional distribution models, and put the earnings power directly into the hands of the creators. We allow creatives to earn the lion's share of the profits; up to 98%.

The essential highlights include:



- **Familiarity** – The FLiK platform will feel intuitive and similar in functionality to other online platforms such as YouTube, Netflix, and Vimeo.
- **Discoverability** – Because FLiK is catering to independent filmmakers and television creatives, our platform will allow viewers to discover new and interesting projects that they might not otherwise have access to.
- **FLiK Tokens** – FLiK tokens will allow token holders to rent or purchase projects, and will grant token holders access to premium features and subscriptions that will not be available to the general public.

Web Development Screenshots





3



## Goals

FLiK is a young and innovative company that aims to bring creative entertainment projects to life, and give creatives from around the world the opportunity to earn a living in an inherently difficult industry.

Specifically, our goals are:

- To develop an online distribution platform that will allow creatives to sell / rent their work.
- To fund a slate (grouping) of unique and creative entertainment projects that might not otherwise receive funding.

## Objective

Currently, we are working with various creatives to identify qualified entertainment projects to fund. Additionally, we are in the process of developing our online viewing platform that allows creatives to sell / rent their projects. The platform will be launched and hosted at www.TheFlik.io.

Our ultimate objective is to fund creative film and television projects and give *all* such projects an online home on a unique and innovate viewing platform that benefits **the creatives**.

## FLiK Streaming

FLiK is developing a world-class video streaming platform that gives creatives the ability to self-distribute their film or television show to a global audience. We eliminate the cumbersome traditional distribution models, and put the earnings power directly into the hands of the creators. We allow creatives to earn the lion's share of the profits; up to 98%.









**Mobile App Development Screenshots**

(/web/20180327060039/http://www.the_ilt.io/uploads/5/6/9/3/56936369/splash-vi-mockup_6_orig.jpg)





(/web/20180327060039/http://www.theflik.io/uploads/5/6/0/2/56020202/sign-in_7_orig.jpg)

(/web/20180327060039/http://www.theflik.io/uploads/5/6/0/2/56020202/forgot-password_7_orig.jpg)







(/web/20180327060039/http://www.theflik.io/white-paper.html)

(/web/20180327060039/http://www.theflik.io/white-paper.html)



| | |
|---|---|
| Monday | **989** |
| Tuesday | **2,974** |
| Wednesday | **2,641** |
| Thursday | **4,018** |
| Friday | **2,103** |
| Saturday | **4,981** |
| Sunday | **4,076** |
| Total Views | **21,782** |

## Integrated Viewing Platforms

In addition to the FLiK viewing platform, we aim to integrate with additional platforms in order to allow viewers the most convenient viewing options for their needs.  These additional platforms could include platforms such as:

11



(https://archive.org/account/login.php)

http://www.theflik.io/white-paper.html

About this capture

12 Aug 2017 – 27 Mar 2018





## FLiK Funding

Traditional film and television funding is an arduous, antiquated, and time-consuming process involving a host of bankers, lawyers, and investors. Funding a film or television show often takes years and sometimes decades. It doesn't have to be like this. FLiK works with qualified creatives and Producers to get projects funded quickly and efficiently.

The projects that FLiK helps fund will be available exclusively on the FLiK platform, therefore it is imperative that FLiK develops the right projects. Deciding what projects to fund and develop is certainly not easy. FLiK has developed the following five criteria to determine if a project is "green-lit":

- **Story** – Every successful project begins and ends with a good story. The FLiK team will evaluate scripts based on the uniqueness of the story, its intended audience, and overall appeal.
- **Economic Viability** – Once a script has been approved, it will be compared against similar projects to determine the overall success of such projects. In the industry, this is called "comps".
- **The Budget** – After the script has been approved, and an economic viability demonstrated, FLiK will determine if the project can be Produced within a reasonable budget.
- **Production Team** – FLiK will determine if the Production team (Producer, Director, Writer) have the ability to produce the project on-time and on-budget.

12



- **Sales Strategy** – FLiK will analyze the sales and distribution strategy presented by the Production team to ensure it's a viable approach in maximizing FLiK's investment and reaching the largest audience possible.

FLiK Tokens

FLiK token holders will be able to rent or purchase film and television projects on the FLiK platform. Additionally, we will integrate with additional viewing platforms to allow them to utilize FLiK tokens; these platforms could include: iTunes, Amazon, Vimeo, Google Play, Roku, Redbox, Fandango, Vudu, and many more. As additional platforms integrate with FLiK, FLiK token holders will have increased options to spend their tokens. In addition to FLiK tokens, additional payment options on the FLiK platform will include: fiat currency and cryptocurrencies such as Bitcoin, Ethereum, and Dash. FLiK tokens are ERC20-compliant tokens.

# FLiK Team



### Ryan Felton

FOUNDER | CO-OWNER

FLiK was founded by Ryan Felton, an entertainment executive in Atlanta, GA. Mr. Felton has a proven history of founding successful entertainment-related businesses, and has worked with a multitude of television networks, corporate brands, and film & television shows. Recent projects include: 'Stranger Things', 'Monday Night Football', 'Queer Eye for the Straight Guy', 'Dynasty', 'Rolling Stone Magazine', and 'National Geographic'.

Additionally, Ryan has Produced and/or Directed such artists & celebrities as: Shaquille O'Neal, John Cena, T.I., Usher, Ludacris, and John Walsh. Ryan is frequent speaker at film and television industry events to address such issues as film finance, State-backed production incentives, and emerging trends within the industry. He is also a longtime member of the Georgia Production Partnership (GPP).

Trivia: Ryan Produced and Directed the first ever Bitcoin-related television commercials. The commercials were created for BitPay and were broadcast nationwide on ESPN in December of 2013 during the 'Bitcoin Bowl' college football bowl game.



(https://archive.org/account/login.php)

About this
capture

http://www.theflik.io/white-paper.html    Go

12 Aug 2017 – 27 Mar 2018

**T.I.**

CO-OWNER

T.I. (Clifford Harris) is an American rapper and actor from Atlanta, Georgia. He signed his first major-label record deal in 1999, with Arista subsidiary LaFace. In 2001, Mr. Harris formed the Southern hip hop group P$C, alongside his longtime friends and fellow Atlanta-based rappers. Upon being released from Arista, he signed to Atlantic and subsequently became the co-chief executive officer (CEO) of his own label imprint, Grand Hustle Records, which he launched in 2003. Mr. Harris is also perhaps best known as one of the artists who popularized the hip hop subgenre trap music, along with Young Jeezy and Gucci Mane.

T.I. has released nine studio albums, with seven of them reaching the top five of the US Billboard 200 chart. Throughout his career, he has also released several highly successful singles, including "Bring Em Out", "Whatever You Like", "Live Your Life" (featuring Rihanna), "Dead and Gone" (featuring Justin Timberlake), "Ball" (featuring Lil Wayne) and "No Mediocre" (featuring Iggy Azalea). T.I. gained major recognition in 2003, following his first high-profile feature, on fellow Atlanta-based rapper Bone Crusher's hit single, "Never Scared". He earned more prominence with the release of Trap Muzik (2003), which includes the Top 40 hits, "Rubber Band Man" and "Let's Get Away". The next year, he appeared on Destiny's Child's international hit, "Soldier", alongside Lil Wayne. His subsequent albums, King and T.I. vs. T.I.P., generated high record sales and were supported by popular singles, such as "What You Know" and "Big Shit Poppin'", respectively.

Harris' sixth album, Paper Trail (2008), became his most successful project, with the album being certified gold for first-week sales of over 500,000 copies in the United States, additionally making it his third consecutive number one album. In 2013, he was featured on Robin Thicke's hit single "Blurred Lines", alongside Pharrell Williams, which peaked at number one on several major music charts. In November 2013, he announced that he had signed with Columbia Records, after his 10-year contract with Atlantic came to an end. He released his Columbia Records debut, Paperwork, in October 2014. In February 2016, he announced a distribution deal with Roc Nation, to release his tenth album. T.I. has won three Grammy Awards, namely Best Rap Solo Performance, Best Rap Performance by a Duo or Group and Best Rap/Sung Collaboration.

Mr. Harris has also had a successful acting career, starring in the films ATL, Takers, Get Hard, Identity Thief, and Ant-Man. He is also a published author, having written two novels Power & Beauty (2011) and Trouble & Triumph (2012), both of which were released to moderate success. He has also starred in the American reality television series T.I.'s Road to Redemption and T.I. & Tiny: The Family Hustle.

Trivia: In 2009, Billboard ranked T.I. as the 27th Artist of the 2000s decade.



**Tony Gallippi**

ADVISORY BOARD

As the co-founder of BitPay, Tony Gallippi has been responsible for a number of large businesses adopting bitcoin payments. During the surge of popularity of bitcoin, Gallippi was featured regularly in the media discussing bitcoin and BitPay. Around the same period, comparisons were drawn between BitPay and PayPal, with some including CNN, suggesting that one day processors like BitPay could eventually replace conventional online payment systems such as PayPal.

In 2013, BitPay became the largest processor of bitcoin payments worldwide, and began securing partnerships with major companies like Microsoft, Intel, VISA, Newegg, Shopify, and more.

Gallippi was invited by the US Senate to speak about bitcoin and the financial markets in November 2013. He stated that fraud coming from credit card payments costs businesses in the United States around $20 billion each year, and bitcoin is a far more secure form of payment for ecommerce.

In 2017 BitPay is processing bitcoin payments at a rate exceeding $1 Billion per year and rapidly growing B2B payments over the bitcoin rails.

The FLiK team is not new to the film and entertainment industries. We own and operate several businesses within the film, television, and entertainment space and have worked with several well known entertainment and other established brands, including: ABC, NBC, Net ix, Coca-Cola, Home Depot, WebMD, ESPN, BET, Under Armour, and many more. FLiK's entertainment-related owned businesses include: AVA | Atlanta Video & Advertising, Big Peach Studios, CastingExchange.com, and Felton Films. In short, the FLiK team understands the industry and knows how to start, run, and grow a successful business.



(https://archive.org/account/login.php)

http://www.theflik.io/white-paper.html    Go

12 Aug 2017 – 27 Mar 2018

About this capture





Big Peach Studios is a  lm & television studio with 27,000 sq. ft. of studio space, production facilities, and amenities. They also rent professional industry gear to provide the tools that projects need for their production. Big Peach was named the 2016 and 2017 'Movie Studio of the Year' in the Atlanta area, and have hosted a wide-variety of  lm and television projects.

CastingExchange.com has been an industry leading resource for the  lm, television, and entertainment industry, since 2011.  The site provides news and opinion as well as technical analysis for the industry, and has a social media following of more than 175,000. Casting Exchange will serve as a news source to help promote and raise awareness for FLiK related projects.

Felton Films is a  lm production company based in Atlanta, GA.  Their mission is to produce  lms that highlight signi cant historical events or raise awareness and understanding of current social issues. They are responsible for the funding, development, and distribution deals of the  lms we collaboratively develop.  To put it simply, they will make and sell  lms.

## Longterm

While our initial focus is on the  lm and television industries, FLiK is also thinking longterm.  We envision additional use cases and applications for FLiK in other industries such as Music and Gaming.  This ensures that FLiK is around for the longterm, and becomes increasingly popular.

## Why is FLiK Having a Crowdsale?

We want to offer an opportunity for everyone to become involved in the early stages of this exciting project, and create an opportunity for everyone to be part of this revolutionary movement. And here's what makes FLiK so unique - the more FLiK token users use our platform, the more prosperous it becomes for the creatives, and the more rewards

token holders enjoy.  Additionally, the more FLiK tokens become adopted and integrated with additional viewing platforms such as iTunes, Google Play, Vimeo, etc, the options for FLiK token holders to utilize their tokens is greatly increased.

http://www.theflik.io/white-paper.html    Go

can include:

- Access to in-person events with the cast and crew for FLiK funded projects
- Access to a  lm set during production for FLiK funded projects
- Access to private  lm screenings and premiers for FLiK funded projects

## About the Crowdsale

A total of 50,000,000 tokens are available for *purchase* during our sale; 500,000,000 are available for distribution (see "Important Update" below for details). FLiK tokens are ERC20-compliant tokens. **All unsold tokens will be burned**.

## Use of Funds

- 50% will be used for licensing content from major studios.
- 25% will be used to fund unique and creative  lm projects.
- 15% will be used for marketing and promotion of the FLiK platform.
- 10% will be used for implementation with additional viewing platforms.

### IMPORTANT UPDATE

FLiK is excited to announce that the company has secured a signi cant investment through a private placement offering in accordance with the Securities & Exchange Commission (SEC) Rule 501 of Regulation D. FLiK's founder, Ryan Felton, says, "We're pleased that our investors have seen the outstanding potential of FLiK. This investment allows us to complete the buildout and deployment of our streaming platform.  Additionally, we have lowered the amount of capital we aim to raise via our ICO, which will be used to license content libraries from major studios.  As a result, our token buyers are able to acquire a substantial amount of FLIK tokens at signi cantly reduced pricing". **To achieve this, we are making the following changes to our ICO:**

- **For every FLIK token you purchase, you will receive 9 additional FLIK tokens at the conclusion of the sale.**
- **Sale will close once 50,000,000 tokens have been sold or on September 20; whichever comes  rst.**

## Token Distribution

When you purchase your FLIK tokens, you will automatically receive your tokens in your Ethereum ERC20 compatible wallet. Then, at the conclusion of our sale, you will receive an additional 9 tokens for every 1 token you purchased.  Buyers who have purchased tokens prior to this update, will also receive 9 additional tokens for every 1 token at the conclusion of the sale.

For example, if you purchase 500 FLIK Token today:

- You Receive 500 FLIK today
- You Receive 4,500 FLIK at the conclusion of the sale

17



- You Receive 5,000 FLIK in total

## ETH / FLIK Conversions

- 10 ETH = 50,000 FLIK (5,000 now + 45,00 Bonus)
- 100 ETH = 500,000 FLIK (50,000 now + 450,000 Bonus)
- 200 ETH = 1,000,000 FLIK (100,000 now + 900,000 Bonus)
- The conversion examples include the 9x additional tokens

## Conclusion

Blockchain technologies are changing the world and FLiK wants to be there when it happens by offering an innovative platform and cryptographic token that will change the way entertainment projects are funded, distributed, and paid for.

With this Token Crowdsale we're offering you a new business model, which in our vision is bound to succeed.

**Join the entertainment revolution!**

## DISCLAIMERS & RISKS

We believe it is vitally important that you read and fully understand the following risks:

This document is for informational purposes only and does not constitute an offer or solicitation to sell shares or securities in FLiK or any related or associated company. Any such offer or solicitation would only be made by a con dential offering memorandum and in accordance with applicable securities and other laws. None of the information or analyses presented are intended to form the basis for any investment decision, and no speci c recommendations are intended. Accordingly, this document does not constitute investment advice or counsel or solicitation for investment in any security. This document does not constitute or form part of, and should not be construed as, any offer for sale or subscription of, or any invitation to offer to buy or subscribe for, any securities, nor should it or any part of it form the basis of or be relied on in any connection with, any contract or commitment whatsoever. FLiK expressly disclaims any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from: (i) reliance on any information contained in this document, (ii) any error, omission or inaccuracy in any such information or (iii) any action resulting therefrom. The FLiK Token, or "FLIK", is a cryptographic token used by the FLiK application.

For those seeking to purchase FLiK tokens for the purpose of trading or otherwise pro ting from FLiK tokens, you must understand that the purchasing of cryptographic tokens, including FLiK tokens, is speculative in nature and involves substantial risk of loss. We encourage all token buyers to purchase carefully. We also encourage token buyers to get personal advice from a professional advisor and to make independent investigations before acting on information that we publish. Due to the volatility associated with cryptographic tokens, we cannot assure you that the information is accurate or complete. We do not in any way warrant or guarantee the success of any action you take in reliance on